# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### ASHEVILLE DIVISION
#### 1:04cv68

| | | |
|---|---|---|
| DARCI ANN O'NEILL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| Vs. | ) | **MEMORANDUM AND** |
| | ) | **RECOMMENDATION** |
| HENDERSON COUNTY HOSPITAL | ) | |
| CORPORATION, d/b/a MARGARET | ) | |
| R. PARDEE MEMORIAL HOSPITAL; | ) | |
| and GAYLE SAMS, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**THIS MATTER** is before the court on defendants' Motion for Summary Judgment. Having considered defendants' motion, plaintiff's response, and defendants' reply, the court enters the following findings of fact, conclusions of law, and recommendation.

## FINDINGS AND CONCLUSIONS

### I.     Nature of the Case

This action concerns the termination of Darci Ann O'Neill's employment with defendant Margaret R. Pardee Memorial Hospital soon after she informed her supervisor that she would be taking 12 weeks of maternity leave under the Family Medical Leave Act, hereinafter "FMLA." Plaintiff has averred that at the time she provided such notice, the hospital was aware that her unborn child suffered from Trisomy 18.[1] Plaintiff contends that

---

[1]     The undersigned has taken judicial notice of the following description of such condition, which is found in the National Institute of Health's online *Medical Encyclopedia*:

Trisomy 18 is a relatively common syndrome affecting approximately 1 out of 3,000 live births and affecting girls more than three times as often as boys. Multiple abnormalities are associated with the presence of an extra number 18

the given reason for her termination - - accessing pornographic websites while on duty, nearing the end of her third trimester - - is pretext for discrimination under the FMLA, and that the true reason for her termination was economic in that she had accrued in excess of $4,000 in leave and that the hospital, which provides medical insurance to its employees through a self-insured program, could have incurred substantial monetary loss. As the district court earlier found in denying defendants' Motion to Dismiss, plaintiff has alleged a federal cause action under the FMLA, a cause of action for Intentional Infliction of Emotional Distress, and wrongful discharge from employment in violation of the public policy of North Carolina.

Discovery has closed and defendants have timely moved for summary judgment, arguing that they are entitled to judgment as a matter of law on all claims, inasmuch as plaintiff can not prove as to her FMLA claim a causal connection between her exercise of an FMLA right and her termination and also cannot prove, in rebuttal, that the reason given for her termination, viewing internet pornography, was a pretext for FMLA discrimination. Defendants also argue that if the FMLA claim fails, so do the remainder of the supplemental state law claims.

In response to defendants' motion, plaintiff filed a timely response accompanied by

---

chromosome. Many of these abnormalities are not compatible with more than a few months of life. Few infants survive beyond the first year. Common findings include low birth weight, mental retardation, low-set ears, malformed ears, small jaw (micrognathia), hand abnormalities, congenital heart disease, hernias, and undescended testicle (cryptorchidism). There may be many other abnormalities noted.

* * *

Treatment is supportive, but life-sustaining measures are not recommended.

U.S. National Library of Medicine,"Trisomy 18" Douglas R. Stewart, M.D. According to plaintiff's deposition, her child died.

exhibits and excerpts of multiple depositions. Defendants filed a timely reply and submitted evidence in support of such reply. It appearing that all issues have been ably briefed by respective counsel, the defendants' Motion for Summary Judgment is ripe for disposition.

## II.    Summary Judgment Standard Generally

On a motion for summary judgment, the moving party has the burden of production to show that there are no genuine issues for trial. Upon the moving party's meeting that burden, the non-moving party has the burden of persuasion to establish that there is a genuine issue for trial.

> When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. In the language of the Rule, the nonmoving [sic] party must come forward with "specific facts showing that there is a *genuine issue for trial*." Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no "genuine issue for trial."

Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted; emphasis in the original) (quoting Fed. R. Civ. P. 56). There must be more than just a factual dispute; the fact in question must be material and readily identifiable by the substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).

By reviewing substantive law, the court may determine what matters constitute material facts. Anderson, supra. "Only disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment." Id. at 248. A dispute about a material fact is "genuine" only if the evidence is such that "a reasonable jury could return a verdict for the nonmoving party." Id. The court must credit factual disputes in favor of the party resisting summary judgment and draw inferences favorable to that party if the inferences are reasonable, however improbable they may seem. Cole v. Cole, 633 F.2d 1083, 1092 (4th Cir. 1980). Affidavits filed in support of a defendants' Motion for Summary Judgment are to be used to determine whether issues of fact

exist, not to decide the issues themselves. <u>United States ex rel. Jones v. Rundle</u>, 453 F.2d 147 (3d Cir. 1971). When resolution of issues of fact depends upon a determination of credibility, summary judgment is improper. <u>Davis v. Zahradnick</u>, 600 F.2d 458 (4th Cir. 1979).

In determining whether a genuine issue of material fact exists, the admissible evidence of the non-moving party must be believed and all justifiable inferences must be drawn in his or her favor. <u>Anderson</u>, <u>supra</u>, at 255. In the end, the question posed by a summary judgment motion is whether the evidence "is so one-sided that one party must prevail as a matter of law." <u>Id.</u>, at 252.

## II.    Plaintiff's FMLA Claim

### A.    Rights Afforded Plaintiff Under the FMLA Generally

The FMLA grants an "eligible employee" the right to 12 workweeks of leave over any period of 12 months based on any of the following events: (1) the birth of the employee's child, in order to take care of the child; (2) the placement of a child with the employee for adoption or foster care; (3) the need to care for the employee's child, spouse, or parent, if the child, spouse, or parent has a serious health condition; or (4) a serious health condition that makes the employee unable to perform the functions of the employee's position. 29 U.S.C. § 2612(a)(1).

Congress enacted the Family Medical Leave Act ("FMLA"), 29, United States Code, Sections 2601 <u>et seq.</u>, in order to afford individuals, who suffered serious health conditions or who needed to provide care for a close family member, with up to 12 weeks of unpaid medical leave per year. <u>See</u> 29 U.S.C. § 2612(a)(1). Where leave is granted, the FMLA requires employers to reinstate employees to a same or similar position following their leave. 29 U.S.C. § 2614(a). If an employer fails to abide by this rule, liability can result under

Section 2615(a)(1).

**B.    Causes of Action Under the FMLA**

**1.    Interference With Substantive Rights Under the Act**

Employees who qualify are entitled to two separate protections under the FMLA. First, a qualified employee receives protections which stem from the language of the statute, and include entitlements such as

(1)    the right to take up to 12 weeks of leave in a single year for the care of a serious health condition, as defined by the statute, for the serious health condition of a member of the employee's immediate family, or for the birth or adoption of a child;  29 U.S.C. § 2612(a)(1)

(2)    the right to be reinstated to the same or an equivalent position upon returning from qualified FMLA leave; 29 U.S.C. § 2614(a)

The FMLA prohibits employers from denying or interfering with these rights and other substantive rights established by the statute.  29 U.S.C. §2615(a)(1). To survive summary judgment on a claim of violation of a statutory right, the employee must merely demonstrate that she was entitled to exercise a right under the statute and that such right was denied. Findlay v. PHE, Inc., 1999 WL 1939245, at *2 (M.D.N.C. April 16, 1999).[2]  In determining whether a violation of the employee's statutory rights occurred, the intent of the employer is irrelevant.  Id.  Plaintiff does not appear to allege this type of violation in her Complaint or responsive pleadings.

**2.    Retaliation**

In a separate category, the FMLA also protects an employee from retaliation and discrimination for exercising her FMLA rights.  29 U.S.C. § 2615(a)(1) & (2).  As opposed

---

[2]    This is the only citation available.

to the minimal showing necessary to establish a claim for violation of the substantive rights provided under the statute, a plaintiff who alleges that her employer retaliated against her for exercising FMLA rights has an elevated burden. Because the subjective intent of the employer is at issue and direct evidence of such intent is seldom found, courts employ a burden-shifting analysis for considering circumstantial evidence relevant to retaliation claims in FMLA cases. Cline v. Wal-Mart Stores, Inc., 144 F.3d 294, 301 (4th Cir.1998).

The shifting-burdens framework was established by the United States Supreme Court in the context of Title VII actions in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973); Nichols v. Ashland Hosp. Corp., 251 F.3d 496, 502 (4th Cir.2001). This three-pronged analysis consists of (1) the *prima facie* case established by the plaintiff, (2) the articulation by the employer of a non-discriminatory reason for its action, and (3) a showing by the employee that such reason was pretext. Id.

First, to make out a *prima facie* case, a plaintiff has the initial burden of proffering evidence showing each of the following elements:

> (1)     that she exercised an FMLA protected right;
>
> (2)     that she suffered an adverse employment action; and
>
> (3)     that there is a causal connection between the first two elements.

Blankenship v. Buchanan Gen. Hosp., 140 F.Supp.2d 668, 674 (W.D.Va. 2001). The burden of proving a *prima facie* case is not onerous. Id., at 674 (citing Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981)).

Second, if plaintiff can satisfy the initial burden of establishing a *prima facie* case, an inference of discrimination arises and the burden then shifts to the employer to articulate a legitimate, non-discriminatory reason for the employment action it took. Nichols, supra. Because the burden is one of production, the employer is not required to persuade the court

that the articulated reason was the actual motivation underlying the employment decision. King v. Preferred Technical Group, 166 F.3d 887, 892 (7th Cir.1999).

Third, if the employer satisfies its burden of production, the burden then shifts back to the employee to show that the articulated reason is mere pretext for discrimination. Nichols, supra. Pretext may be proved by the employee producing evidence of a discriminatory motive on the part of the employer or by showing that "the employer's proffered explanation is unworthy of belief." Yashenko v. Harrah's N.C. Casino Company, LLC, 352 F.Supp.2d 653, 661 (W.D.N.C. 2005)(Thornburg, J.) (citations omitted). At the third step, the plaintiff must "'prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'" Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 143 (2000).

Finally, as the proponent of the litigation, plaintiff at all times bears the burden of persuasion in showing that she was the victim of defendants' intentional discrimination. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507 (1993).

## C. Plaintiff Has Established a Prima Facie Case

It is undisputed that plaintiff filed a written request for 12 weeks of FMLA leave on May 16, 2003. See Plaintiff's Exhibit A. Plaintiff has, therefore, exercised an FMLA protected right, satisfying the first element of a *prima facie* case. Blankenship, supra.

It is also undisputed that on June 3, 2003, plaintiff's employment was terminated , as evidenced by a letter signed by defendant Gayle Sams. Plaintiff's Exhibit L. Plaintiff has suffered an adverse employment action, satisfying the second element of a *prima facie* case. Blankenship, supra.

Having satisfied the first two elements, plaintiff must also establish that there is a causal connection between the first two elements, i.e., her termination and the exercise of an

FMLA protected right. A common method of satisfying this requirement is through a showing of "temporal proximity" between plaintiff's written request for leave and her termination. "Generally, a plaintiff may establish such a link through evidence that the discharge took place on the heels of protected activity." Dey v. Colt Constr. & Dev. Co., 28 F.3d 1446, 1458 (7th Cir. 1994). Where a plaintiff produces evidence of temporal proximity, such a connection "is generally enough to satisfy the third element of the prima facie test." Rabinovitz v. Pena, 89 F.3d 482, 489 (7th Cir.1996). Close temporal proximity between the first two elements has been held to satisfy the third element of a *prima facie* case. Carter v. Ball, 33 F.3d 450, 470 (4th Cir. 1994) (five months); Williams v. Cerberonics, Inc., 871 F.2d 452 (4th Cir. 1989) (four months). Likewise, distant temporal proximity may indicate no retaliatory motivation. See Mize v. Jefferson City Bd. of Educ., 93 F.3d 739 (11th Cir. 1996).

In this case, plaintiff has shown that not only did she submit an FMLA leave request on May 16, 2003, see Plaintiff's Exhibit A, it was signed by Defendant Sams that same day. id., and that she was terminated 18 days later through a letter signed by Defendant Sams. Plaintiff's Exhibit L. The undersigned finds, as a matter of law, that events occurring within 18 days to be of close temporal proximity.

Plaintiff has further shown that Defendant Sams investigation into her purported on-the-job internet activities began within days, despite the results of an investigation that was completed by the hospital's computer staff that offered alternative explanations of how such material could have been accessed without plaintiff's knowledge. Plaintiff's Exhibits B,C, & D. Eighteen days later, and a little more than 30 days before the requested FMLA leave was to commence, plaintiff was terminated by way of a letter that was also signed by Defendant Sams. Plaintiff's Exhibit L. Plaintiff has, therefore, established a causal connection not only through temporal proximity, but through circumstantial evidence which,

when taken in a light most favorable to the party resisting summary judgment, could lead a jury to find a substantive connection between the protected activity and the adverse employment action.

### D.    Defendants' Articulation of a Legitimate, Non-Discriminatory Reason

Where a plaintiff establishes a *prima facie* case of discrimination, an inference of FMLA discrimination arises, which can be rebutted by defendant showing that it had a legitimate, non-discriminatory reason for the action it took. Here, defendants have produced evidence showing that they terminated plaintiff's employment for violation of the hospital's internet usage policy by purportedly viewing pornography online at work.

Because defendants' burden is merely one of production, the employer is not required to persuade this court that the articulated reason was the actual motivation underlying the employment decision. <u>King</u>, <u>supra</u>. Clearly, viewing internet pornography on the job in violation of a corporate policy is a legitimate, non-discriminatory reason for the termination of any employee. By way of exhibits, affidavits, and deposition testimony, defendants have satisfied their burden of production and articulated a legitimate, non-discriminatory reason for the employment action taken against plaintiff.

### E.    Pretext

Defendants having satisfied their burden of production, the burden now shifts back to plaintiff to show that the articulated reason is mere pretext for discrimination. <u>Nichols</u>, <u>supra</u>.

> [T]he only effect of the employer's nondiscriminatory explanation is to convert the inference of discrimination based upon the plaintiff's *prima facie* case from a mandatory one which the jury must draw, to a permissive one which the jury may draw, provided that the jury finds the employer's explanation 'unworthy' of belief.

<u>Manzer v. Diamond Shamrock Chemicals Co.</u>, 29 F.3d 1078, 1083 (6th Cir.1994). The

appellate court in <u>Manzer</u> further held that

> [O]nce the employer has come forward with a nondiscriminatory reason for firing the plaintiff, we hold that the plaintiff must produce sufficient evidence from which the jury may reasonably reject the employer's explanation.

<u>Id.</u>, at 1083 (citation omitted). To show pretext in this district, plaintiff must now come forward with evidence upon which the finder of fact could determine that the defendants had a discriminatory motive or that "the employer's proffered explanation is unworthy of belief." <u>Yashenko</u>, <u>supra</u>, at 661.

Plaintiff's first argument in support of its burden of showing defendants' explanation unworthy of belief is financial motivation. Plaintiff argues that both defendants had a financial interest in terminating plaintiff's employment rather than providing her FMLA benefits. Plaintiff's Response, at 20-21. Defendants point out that plaintiff's counsel has, in making such arguments, failed to provide citations to the record, making such statements conclusory. The undersigned agrees with defendants and finds such oversight to be frustrating. The undersigned has a duty, however, to determine whether *evidence of record* has in fact been submitted that could show pretext, and has carefully reviewed each exhibit submitted to the court to determine whether there is any evidence of record that would support a finding of pretext.

Specifically, plaintiff argues that "[b]oth Defendants would benefit financially from terminating the Plaintiff instead of paying her accrued time off during her FMLA leave ...." Plaintiff's Response, at 20. The court has read all of the deposition excerpts, and notes that only excerpts of the depositions have been filed by both sides. While such practice is both common and acceptable, a complete set of transcripts would have been more useful in this particular case.

The undersigned has carefully read the portions of the transcript provided as to the

depositions of Defendant Sams. While capable of reading both in favor of defendants and against defendants, Defendant Sams provided testimony that could be viewed as supporting a finding that she did have a personal financial interest in terminating plaintiff's employment. Read in a light most favorable to plaintiff, although perhaps not the only reading, the jury could determine that Defendant Sams, by terminating the plaintiff could have avoided her department incurring costs, increasing Defendant Sams' chances of receiving extra compensation:

> Q. What is the criteria that Lora Harris used in December of 03 besides the evaluations for determining whether a raise was appropriate for you?
>
> A. By utilizing a job description and a leadership evaluation.
>
> Q. What factors factored in other than evaluations and I think you said budget, that you didn't meet budget.
>
> A. Correct.
>
> Q. So in order to be recommended for a raise, what do you have to do?
>
> A. Manage your unit, manage your staff, customer service, responsibilities in general. There are several pages. I don't recall how many pages but I believe it's three pages that we're evaluated on, several times.
>
> Q. But the two areas where she found your performance deficient was in evaluations of your employees and in not meeting your budget?
>
> A. Correct.

Sams Depo., at 30.

The court has also read the excerpts from the deposition of Ms. Lora Harris, who is Defendant Sams' supervisor, and part of her testimony appears to be relevant to financial motivation, as follows:

Q.      You mentioned that if they're [managers] able to stay within the margin, then that plays a part in their - - whether they might get a pay increase?

A.      Uh-huh

Q.      Do you recall if Gayle [Sams] was in Budget in 03?

A.      I can't say that for sure.

Q.      But I think you said you didn't know whether you recommended a pay increase for her or you didn't recall?

A.      I don't believe I did.

Q.      Why do you think you might not have?

A.      .... And I don't believe she met all of these indicators a hundred percent.

Q.      Staying within budget is just one of those standards?

A.      Yes.

Harris Depo., at 25.

Further, Ms. Harris testified that "[o]ne of the objectives of all manager evaluations is that they stay within a margin of their budget" and that the margin "varies over time by 2 percent." Harris Depo., at 25. While defendants argue for inferences that would favor a finding of no pretext, this testimony could be reasonably interpreted by a jury as supporting plaintiff's argument that Defendant Sams had a financial interest in terminating plaintiff's employment.

Further, the Second Affidavit of Hope Reynolds, which was executed after plaintiff filed her response to defendants' motion, lends additional support to plaintiff's theory of financial savings by defendants. In that affidavit, Ms. Reynolds, the Human Resources Director or the hospital, avers that the value of plaintiff's accrued leave, i.e., the amount the

hospital would have to pay plaintiff had it fulfilled her FMLA request, amounted to $4,166.66.[3] Second Reynolds Affidavit, at ¶¶ 1 & 3. It is unclear from this affidavit whether this amount includes Social Security matching and other employee benefits saved by the hospital. In any event, Ms. Reynolds avers that because plaintiff was involuntarily terminated, none of plaintiff's accrued vacation, sick, or holiday time was payable to her. See Second Reynolds Affidavit, at ¶ 4. This evidence could be viewed by a jury as supporting plaintiff's claim of financial motivation.

Defendants also state in their reply that the hospital was self insured for purposes of providing their employees with health benefits. See Defendants' Reply, at 10. While defendants have argued that "self insurance" is evidence that would cut against a finding of financial incentive - - the drop in the bucket theory - - self insurance also gives rise to an inference favorable to plaintiff's showing of pretext. In the Second Affidavit of Hope Reynolds, additional evidence is provided that the hospital's annual exposure under the self-insurance plan for plaintiff's health care benefits during 2003 was $110,000.00, after which the self-insured plan's reinsurer would reimburse the hospital for any additional claims by plaintiff. Second Reynolds Affidavit, at ¶ 3. Again, this would be evidence that a jury could find relevant to the inquiry as to financial motivation. No evidence has been presented as to the projected costs for delivery and care of a child with Trisomy 18.

Plaintiff has also presented an exhibit from the public domain concerning the financial condition of the hospital during the summer of 2003. This exhibit appears to be an online version of a newspaper article, which was apparently introduced into evidence during

---

[3]     Defendants argue that "[c]ertainly this amount is not a substantial financial savings for a public hospital." Reply, at 6. They fail to attribute counsel's conclusion to an affidavit or sworn testimony of a witness, and they failed to cite Ms. Reynold's Second Affidavit as the source for the dollar value of plaintiff's leave, which are the same errors defendants pointed out as to plaintiff's brief.

plaintiff's deposition.  <u>See</u> Plaintiff's Exhibit N.  The article, dated July 13, 2003, appears to follow closely on the heels of plaintiff's June 3, 2003, termination, and discusses more than a dozen layoffs at defendant hospital that summer as well as the financial condition of the hospital. The article is unaccompanied by an authenticating affidavit, and the internet, while becoming more a part of daily life and a repository of information, is simply not the most reliable source of information. Rule 901(a), Federal Rules of Evidence, provides, however, that the requirement of authentication "is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed.R.Evid. 901(a).  In this case, the article appears to be taken from a website maintained by the *Hendersonville Times-News,* which is a newspaper of general circulation well known in this district and to this court, and the article has a byline attributing such article to a known reporter at the paper.

Inasmuch as defendants have not otherwise objected under Rule 56(e) to plaintiff's submission of such document (which would likely have been sustained), the undersigned will consider such exhibit.  Plaintiff is cautioned that it is likely that such document, without more foundation, would be inadmissible if simply tendered at trial.  It may, however, be appropriate for use in examination of Robert Goodwin, defendant hospital's CEO, if he is subpoenaed to testify.

The thrust of such article is that 13 workers at the hospital were laid off in the summer of 2003 due to "[l]ower Medicare reimbursement rates, increased expenses, bad debt and malpractice insurance rates. . . ." Plaintiff's Exhibit N, at 1.  As defendants argue, the article also shows that the hospital was planning to hire 14 more nurses and that "new nursing grads" are "'all in very high demand.'"  <u>Id.</u>  Thus, the article cuts both ways: it is helpful to plaintiff in that it shows defendant hospital was in a financial bind when it terminated her employment; and it helps defendants in rebutting such showing inasmuch as nurses were

being hired.  Such article may arguably cut back again, inasmuch as an inference arises that the hospital was looking to "new grads," who are may well be younger, less expensive, and more healthy workers.

In addition to attempting to show pretext through financial incentive, plaintiff has also presented evidence attacking Defendant Sams' investigation and  the severity, uniqueness, and disproportionate nature of the punishment she received.  Nearly one half of the 75 pages of arguments presented by respective counsel are devoted to summaries of the facts underlying this case.  Of those pages devoted to the facts, much of the discussion centers on the details and quality of the investigation Defendant Sams conducted.  By attacking the investigation, plaintiff is attempting to show that the reason given by the hospital for her termination - - viewing internet pornography - - should not be believed.  At this point, it is not the role of the court to determine any of the issues, but merely to determine whether a genuine issue of material fact exists for the jury.  Plaintiff has presented evidence that:

(1)     Defendant Sams ignored the alternative explanations provided by the hospital's own computer experts concerning how the pornographic websites could have been accessed and logged under plaintiff's user identification by someone else, and instead launched her own investigation in temporal proximity to plaintiff notifying Defendant Sams that she desired to take the full leave provided under the FMLA;(Yaekel Depo., at 22, 25, 26, & 32; Posey Depo., at 75; Sams Depo., at 87)

(2)     plaintiff was not consulted by Defendant Sams during her investigation, even though the hospital's procedure manual provided for her participation in any investigation; (Plaintiff's Exhibit M)

(3)     plaintiff was the one who reported the unexplained internet pornography on

her terminal to appropriate hospital authorities; (Marcovic Depo., at 98 & 101; Sargsyan Depo., at 29-30)

(4)     plaintiff was in her third trimester of a pregnancy with complications at the time she was supposedly viewing prurient sexual images at what was apparently a portable, multi user, wireless computer terminal, on a push cart, in a public area of the hospital; (O'Neill Depo., at 86, 96-97, & 211-13; O'Neill Depo.2, at 8-9)

(5)     such punishment was unique to her, in that other employees had committed the same offenses and were not terminated; (Plaintiff's Exhibit L; Yaekel Depo., at 35-38; Posey Depo., at 84)

(5)     such punishment was disproportionate, in that a certified nursing assistant involved in patient care had shown up to work intoxicated and was allowed to receive progressive discipline, placed on probation, and not terminated until she violated such probation; (Marcovic Depo., at 24-26, 32-34) and

(6)     plaintiff was the first and only person[4] ever fired at defendant hospital for purportedly viewing internet pornography. (See Markovic Depo.)

To summarize, plaintiff is arguing that a jury could find defendants' given reason for her termination to be pretextual when all the evidence of record is considered in its entirety. The undersigned agrees.

The Court of Appeals for the Sixth Circuit found that summary judgment was not appropriate where plaintiff had made a similar circumstantial showing:

---

[4]     Markovic testified that another employee, a male nurse, had been terminated for viewing pornography, but he did not recall the employee's name. See Markovic Deposition excerpts. Even though the deposition was recessed and recommenced the next day, counsel for the respective parties do not appear to have followed up on this line of questioning. Again, the lack of complete transcripts has hindered the court in fully reviewing this deposition.

Given the timing of the alleged complaints, particularly in light of previously outstanding job evaluations; the absence of any complaints in the record prior to 1996; Defendants' failure to question Plaintiff or her immediate supervisors about the alleged complaints; Defendants' failure to allow Plaintiff an opportunity to respond to the alleged complaints; and the absence of any teacher being denied tenure after having been nominated by the principal, a jury could reasonably conclude that Defendants' reasons for denying Plaintiff tenure were mere pretext. Furthermore, "on a motion for summary judgment, the evidence presented by the non-moving party is to be taken as true and all reasonable inferences that may be drawn therefrom are to be drawn in the non-moving party's favor." Hollins v. Atlantic Co., Inc., 188 F.3d 652, 660 (6th Cir.1999). Because Plaintiff has demonstrated genuine issues of material fact as to the legitimacy of Defendants' reasons, this case cannot be disposed of on summary judgment.

Shaw v. Danley, 2000 WL 64945 (6th Cir. 2000) (copy placed in file by reference).[5]  In this case, the cumulative impact of the evidence proffered in rebuttal could lead a reasonable trier of fact to conclude that plaintiff's termination was in retaliation for invoking her right to 12 weeks of FMLA leave.  Put another way, a reasonable jury could conclude that defendants were looking for a reason to fire plaintiff after she requested the full benefit of the FMLA; that defendants conducted a second investigation when the first apparently offered alternative explanations, that they had a financial motive to violate the FMLA; and that the conclusion defendants drew in finding that plaintiff had accessed internet pornography at work was not supported by the evidence defendants had in their possession or the circumstances surrounding a person in plaintiff's condition.

As defendants correctly point out, plaintiff's brief has flaws in that it fails to connect up certain arguments of counsel with cites to the evidence.  Indeed, the plaintiff's arguments are not always fully supported by the evidence as defendants also argue.  The court's duty under Rule 56 is not, however, to weigh the arguments of counsel, but to determine whether a genuine issue of material fact remains for trial.  The undersigned has carefully reviewed

---

[5]     Due to electronic filing of opinions, the undersigned places unpublished decisions in the docket through reference to the Westlaw citation.

each exhibit, deposition excerpt, and affidavit submitted to the court and determined that not only could plaintiff's proffer support the required finding, numerous pieces of evidence *defendants* have tendered could also be viewed by a jury to support plaintiff's argument of pretext, especially the Second Affidavit of Hope Reynolds.

**F.      Conclusion as to FMLA Claim**

As discussed above, the court must credit factual disputes in favor of the party resisting summary judgment and draw inferences favorable to that party if the inferences are reasonable, however improbable they may seem to the defendants or to the court. <u>Cole</u>, <u>surpa</u>, at 1092.   Without doubt, defendants have made a number of very valid points concerning the manner in which plaintiff has marshaled her evidence.  Indeed, this court has had to spend an inordinate amount of time reorganizing the materials submitted by both sides, and, as to plaintiff's brief, combing through the exhibits to determine which exhibit, if any, matched up with which argument.

This court is required, however, to not attribute the procedural missteps of counsel to the client, but to consider the evidence of record in a light most favorable to the party resisting summary judgment. <u>Id.</u> When considered in that light, a jury could find that defendants' given reason for plaintiff's termination should not be credited and that the real reason for plaintiff's termination was retaliation for exercising FMLA rights.

**III.     Defendant Sams' Motion for Summary Judgment on the Supervisory FMLA Claim Based on Her Status as a "Public Official"**

Defendant Sams has moved for summary judgment contending that as supervisory employee of a community hospital, she is a "public official" who is not subject to suit under the FMLA.  Much different from Title VII, which does not allow for suit against individual supervisors, the FMLA defines "employers" to includes supervisors, as follows:

The term "employer" -

(I)     means any person engaged in commerce or in any industry or activity affecting commerce who employs 50 or more employees for each working day during each of 20 or more calendar workweeks in the current or preceding calendar year;

(ii) includes -

(I)     any person who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer; and

(II)     any successor in interest of an employer;

(iii) includes any "public agency," as defined in section 203(x) of this title

* * *

§ 2611(4)(A).

A great deal of the arguments of the parties concern whether Defendant Sams is in fact a "public official" in her role as a supervisory nurse at a community hospital. Indeed, defendants have gone so far as to submit IRS tax rulings in support of its position. Assuming for the sake of brevity that a community hospital is a public agency and that Defendant Sams as an emergency room supervisor is a "public official" - - which may be a stretch of common sense - - the undersigned is not persuaded by defendants' legal reasoning that the FMLA would prevent suit against her as a public official.

Instead, the undersigned has looked to the recent published decision of Honorable William Osteen, United States District Judge, Middle District of North Carolina, in <u>Sheaffer v. County of Chatham</u>, 337 F.Supp.2d 709 (M.D.N.C. 2004). In <u>Sheaffer</u>, the district court addressed this issue and found that the FMLA does <u>not</u> bar claims against individuals who are public officials. The opinions of Judge Osteen, who frequently sists as a visiting judge in this district, are held in high regard and the undersigned will quote from Judge Osteen's decision at length, inasmuch as it appears dispositive of this issue:

A majority of courts have concluded that public employees can be held liable under the FMLA. *See, e.g., Darby v. Bratch*, 287 F.3d 673, 681 (8th Cir.2002);

-19-

*Cantley v. Simmons*, 179 F.Supp.2d 654, 656-57 (S.D.W.Va.2002) (noting that "[t]he majority of courts that have examined the FMLA's statutory language have concluded that a plain reading indicates that public employees may be considered 'employers' under the FMLA"); *Carter v. United States Postal Serv.*, 157 F.Supp.2d 726, 728 (W.D.Ky.2001) (concluding that "common logic and standard rules of grammar" mandate that public officials be suable as individuals); *Morrow v. Putnam*, 142 F.Supp.2d 1271, 1276 (D.Nev.2001); *Kilvitis v. County of Luzerne*, 52 F.Supp.2d 403, 412 (M.D.Pa.1999) ("[T]he plain language of the FMLA evinces an intent to provide for individual liability."). Nonetheless, some courts have held that public officials cannot be sued as employers under the FMLA. *See, e.g., Mitchell v. Chapman*, 343 F.3d 811, 832 (6th Cir.2003) (concluding, based on a textual analysis, that public employees cannot be held individually liable under the FMLA), *cert. denied*, --- U.S. ----, 124 S.Ct. 2908, 159 L.Ed.2d 813 (2004); *Wascura v. Carver*, 169 F.3d 683, 686 (11th Cir.1999) (applying Fair Labor Standards Act jurisprudence to conclude that no claim under the FMLA could be maintained against public officials); *Keene v. Rinaldi*, 127 F.Supp.2d 770, 778-79 (M.D.N.C.2000) (concluding that public officials may not be sued as employers under the FMLA).

Any resolution of the meaning of a statute must begin with the text of the statute itself. *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989). The plain meaning of the text controls, except where a literal reading of the text would compel an odd result or one demonstrably at odds with legislative intent. *Public Citizen v. United States Dep't of Justice*, 491 U.S. 440, 454, 109 S.Ct. 2558, 2567, 105 L.Ed.2d 377 (1989); *Ron Pair*, 489 U.S. at 242, 109 S.Ct. at 1031. Subsection (4)(A)(iii) includes public agencies within the term "employer." When subsection (4)(A)(ii)(I) refers to "any person who acts, directly or indirectly, in the interest of an employer," there is no reason to suppose that employees of those public agencies, acting in the agencies' interest, would be excluded from the definition. *See Morrow*, 142 F.Supp.2d at 1272-73. Thus, subsection (4)(A)(ii)(I) can be read as including "any person who acts, directly or indirectly, in the interest of an employer, including a public agency." This reading of the statute is also consistent with the physical construction of the text. The em dash after the word "employer" suggests that all four subparagraphs of paragraph (4)(A) modify the word employer, so that employer " 'means' what is provided for in subparagraph (I) and 'includes' what is provided for in subparagraphs (ii), (iii), and (iv)." *Id.* at 1273; *accord Cantley*, 179 F.Supp.2d at 657. *But cf. Mitchell*, 343 F.3d at 830 (noting the lack of punctuation indicating an inter-relationship between subparagraphs (ii), (iii), and (iv), and concluding that they instead should be treated independently); *Keene*, 127 F.Supp.2d at 776 (noting that had subparagraph (ii) been intended to apply to the whole paragraph, it could have been listed at the end, and suggesting that subpart (ii)(II), referring to successors in interest, does not apply to public agencies). Ultimately, this court agrees with the reasoning of *Morrow* and *Cantley*. The simplest reading of the statutory text compels the conclusion that public employees who act, directly or indirectly, in the interest of the public agency for which they work, may be held

individually liable under the FMLA. Discovery may reveal that Clarke did not exercise the requisite level of authority over Plaintiff's employment to be considered an employer under the FMLA. However, the court cannot say that Clarke's position as an official of a public agency compels dismissal as a matter of law. *See Morrow*, 142 F.Supp.2d at 1276. For this reason, Defendant's motion to dismiss Plaintiff's FMLA claim against Clarke in her individual capacity will be denied.

Id., at 727-729 (footnotes omitted). The undersigned, respectfully, adopts the reasoning of Judge Osteen and finds that public officials are not immune from liability under the FMLA.

The undersigned finds that plaintiff has presented evidence that Defendant Sams was acting in the interest of the hospital as well as herself. Further, there appears to be ample evidence of record that Defendant Sams exercised the requisite level of authority over plaintiff's employment, which included the patent ability to terminate plaintiff's employment. See Plaintiff's Exhibit L. The undersigned will, therefore, recommend that Defendant Sams' Motion for Summary Judgment based on her purported public employer status be denied.

## IV.    Wrongful Termination Claim

Defendants have moved for summary judgment on plaintiff's supplemental wrongful termination claim. The district court has already rejected this argument when it was posed by defendants in the form of a Motion to Dismiss, finding that plaintiff stated a claim for wrongful discharge by alleging that "the true basis for her discharge was an attempt by the Defendants to avoid paid leave obligations in violation of the FMLA and the public policy of North Carolina as set forth in N.C. Gen. Stat. § 96-2." Order, Docket Entry 9, at 3. The district court further held that "[u]pon satisfaction of her burden of proof on such allegations, the jury could find wrongful discharge in violation of both the federal and state statutes." Id., at 3-4. Such earlier decision is law of the case, and the only matter left for determination is whether plaintiff has in fact submitted evidence supporting her allegations.

The FMLA has been discussed at length supra. Plaintiff has also asserted that her

termination violated Chapter 96-2 of the North Carolina General Statutes, which provides, as follows:

> **§ 96-2. Declaration of State public policy.**
> As a guide to the interpretation and application of this Chapter, the public policy of this State is declared to be as follows: Economic insecurity due to unemployment is a serious menace to the health, morals, and welfare of the people of this State. Involuntary unemployment is therefore a subject of general interest and concern which requires appropriate action by the legislature to prevent its spread and to lighten its burden which now so often falls with crushing force upon the unemployed worker and his family. The achievement of social security requires protection against this greatest hazard of our economic life. This can be provided by encouraging employers to provide more stable employment and by the systematic accumulation of funds during periods of employment to provide benefits for periods of unemployment, thus maintaining purchasing power and limiting the serious social consequences of poor relief assistance. The legislature, therefore, declares that in its considered judgment the public good and the general welfare of the citizens of this State require the enactment of this measure, under the police powers of the State, for the compulsory setting aside of unemployment reserves to be used for the benefit of persons unemployed through no fault of their own. (Ex. Sess. 1936, c. 1, s. 2.)

N.C.Gen.Stat. § 96-2. The undersigned makes no recommendation on whether plaintiff can state a claim for wrongful discharge based on the FMLA through the public policy pronouncement found in Chapter 96-2, inasmuch as that issue has already been determined and is law of the case. See Findlay v. PHE, Inc., supra;[6] c.f. Buser v. Southern Food Service,

---

[6] In remanding a wrongful discharge claim that was removed based on a perceived invocation of the FMLA , the district court held, as follows:

> [a]ccording to the North Carolina Supreme Court, no statute or case exists which definitively lists all public policy bases available for wrongful discharge claims. *Amos v. Oakdale Knitting Co.*, 331 N.C. 348, 416 S.E.2d 166, 169 (N.C.1992). At the very least, "public policy is violated when an employee is fired in contravention of express policy declarations contained in the North Carolina General Statutes." *Id.* Most often, plaintiffs rely on the public policy declaration contained in N.C. Gen.Stat. § 143-422.2, which states that employment discrimination on the basis of race, religion, color, national origin, age, sex or handicap offends North Carolina public policy.

Id., at *4 (fn. 3).

Inc., 73 F.Supp.2d 556 (M.D.N.C. 1999). Clearly, plaintiff has shown that she was involuntarily terminated from her employment with the hospital. Applying the evidence produced to the court's earlier decision, plaintiff has presented sufficient evidence to create a genuine issue of material fact as to whether her termination amounted to a wrongful discharge under North Carolina law.

The undersigned will, however, recommend that summary judgment be granted to Defendant Sams on the wrongful discharge claim to the extent such claim has been asserted against Defendant Sams. The district court held in an earlier published decision that "North Carolina does not recognize a claim against a supervisor in an individual capacity for wrongful discharge in violation of public policy." Cox v. Indian Head Industries, Inc., 187 F.R.D. 531, 536 (W.D.N.C. 1999).

## V.      Intentional Infliction of Emotional Distress

Defendants argue in their reply that plaintiff cannot have it both ways, i.e., that she cannot allege and maintain both a negligent infliction of emotional distress claim and intentional infliction of emotional distress claim simply through reliance on the district court's earlier determination that plaintiff had implicitly stated a claim for *intentional* infliction of emotional distress.

Apparently, the last sentence of plaintiff's argument on this issue in her brief has given defendants concern that plaintiff is attempting to preserve both claims for trial. Defendants also point out plaintiff's continuing failure to reference actual evidence that would support each and every element of her claim.

Based on the district court's Order of July 2, 2004, the undersigned finds that no negligent infliction of emotional distress claim remains and that plaintiff has stated only a claim for intentional infliction of emotional distress. No recommendation is necessary as

to dismissal of the claim sounding in negligence inasmuch as a prior dismissal of such may be gleaned from the district court's Order.

As to summary judgment on plaintiff's claim for intentional infliction of emotional distress, the elements of the tort are "(1) extreme and outrageous conduct, (2) which is intended to cause and does cause (3) severe emotional distress." Hogan v. Forsyth Country Club, 79 N.C. App. 483, 488, disc. rev. denied, 317 N.C. 334 (1986). "It is a question of law for the court to determine, from the materials before it, whether the conduct complained of may reasonably be found to be sufficiently outrageous as to permit recovery." Id., at 490. For purposes of ruling on defendant's motion, the court has resolved any disputed facts in plaintiff's favor.

Plaintiff's first burden is to produce evidence that defendants' acts exceeded "all bounds of decency," West v. King's Dep't Store, Inc., 365 S.E.2d 621, 625 (N.C. 1988), and that such acts could be "'regarded as atrocious, and utterly intolerable in a civilized community.'" Wagoner v. Elkin City School Bd. of Educ., 440 S.E.2d 119, 123 (N.C. Ct. App. 1994) (citation omitted). Further, the "extreme and outrageous character of the conduct may arise from the actor's knowledge that the other is peculiarly susceptible to emotional distress . . . ." Briggs v. Rosenthal, 73 N.C.App. 672, 677 (1985). The excerpts provided to the court from the depositions of plaintiff and Defendant Sams could clearly support a jury finding that defendants knew plaintiff was pregnant, that she was nearing term, that plaintiff and Defendant Sams knew her unborn child was likely to die *in utero* or die shortly after birth, and that plaintiff was reliant on her job and the medical benefits provided by the hospital. See O'Neill Deposition; Sams Deposition. Where, as here, the alleged tortfeasors are a trained medical professional and a hospital, it is difficult to argue that they would not be aware that a person in such a condition would be "peculiarly susceptible to emotional

distress . . . ." <u>Briggs</u>, <u>supra</u>.

As to severe emotional distress, North Carolina courts have defined this element, as follows:

> any emotional or mental disorder, such as, for example, neurosis, psychosis, chronic depression, phobia, or any other type of severe and disabling emotional or mental condition which may be generally recognized and diagnosed by professionals trained to do so.

<u>Waddle v. Sparks</u>, 331 N.C. 73, 82 (1992). Plaintiff's burden in responding to a motion for summary judgment is to come forward with evidence that would also support a finding in her favor on this element. Again, plaintiff's brief is lacking in this regard; however, the court has closely reviewed plaintiff's deposition, which contains evidence of a severe and disabling emotional condition she contends was brought on by termination. <u>See</u> O'Neill Depo., at 230-35. While medical records for plaintiff are noticeably absent from the record, the testimony is minimally satisfactory in that it references the diagnosis and course of treatment rendered to plaintiff by Dr. Cottingham. Apparently, plaintiff was coping as well as possible with the bad news concerning her unborn child while working at the hospital, but when she was terminated from her employment on the eve of delivery she

> fell apart, I was not a mom. I was very distant, distracted. I couldn't even concentrate, couldn't sleep, couldn't eat. I just couldn't function.

O'Neill Depo., at 231. Apparently, plaintiff has sought and received professional counseling for anger management, which she contends was caused by the stress of her termination. <u>Id.</u>, at 230.

Finally, the undersigned has reviewed relevant North Carolina case law as to defendants' reprised argument that the North Carolina Worker's Compensation Act bars plaintiff's claim for Intentional Infliction of Emotional Distress. This argument appears to be contrary to very persuasive case law on such point. <u>Buser v. Southern Food Service, Inc.</u>,

supra, at 568-71 (M.D.N.C. 1999). The North Carolina Court of Appeals decision that disagreed with Buser found the NCWCA to bar a claim of *negligent* infliction of emotional distress, not *intentional* infliction of emotional distress.  See Riley v. Debaer, 149 N.C.App. 520 (2002).

Finding that the record contains evidence upon which a jury could find for plaintiff on each and every element of her claim for intentional infliction of emotional distress, the undersigned will respectfully recommend that defendants' Motion for Summary Judgment be denied as to such claim.

## VI.    Punitive Damages

Defendants argue that punitive damages are inappropriate under the FMLA. Defendants argument is clearly correct from a reading of the federal statute, which specifies the limits of an aggrieved employee's remedies, which does not include punitive damages. See 29 U.S.C.A. § 2617(a)(1)(A)(I).   In response, plaintiff states that she is not seeking punitive damages under her federal claim, but only in conjunction with her state claims. With that clarification, which the undersigned deems to be a binding stipulation, the undersigned will recommend that defendants' Motion for Summary Judgment as to plaintiff's claim for punitive damages be denied.


## RECOMMENDATION

**IT IS, THEREFORE, RESPECTFULLY RECOMMENDED** that defendants' Motion for Summary Judgment be **DENIED** in its entirety, except to the extent that plaintiff has attempted to assert a claim against Defendant Gayle Sams individually for wrongful discharge, and, as to such claim against Defendant Sams, that summary judgment be **GRANTED** and such claim be **DISMISSED.**

**IT IS FURTHER RECOMMENDED** that this action be placed on for trial during the court's July 2005 Asheville term in accordance with the terms of the Pretrial Order and Case Management Plan.

The parties are hereby advised that, pursuant to 28, United States Code, Section 636(b)(1)(C), written objections to the findings of fact, conclusions of law, and recommendation contained herein must be filed within **fourteen** (**14**) days of service of same. Failure to file objections to this Memorandum and Recommendation with the district court will preclude the parties from raising such objections on appeal. Thomas v. Arn, 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986); United States v. Schronce, 727 F.2d 91 (4th Cir.), cert. denied, 467 U.S. 1208 (1984).

**Signed: May 16, 2005**


Dennis L. Howell
United States Magistrate Judge